Daniels, J.
The infants for whom the respondent was appointed general guardian, were the children of the appellant by his first wife, who died on the 14th of August, 1884. Marie Annita was the oldest, and she was born on the 5th of February, 1875. Samuel A., the younger, was born December 17, 1877. The person who was appointed their guardian is their elder brother, who had attained the age of twenty-one years and upwards previous to the time of his' appointment. The controversy before *324 the surrogate, as it is upon the appeal, was whether the appellant, the father of the infants had become, by reason of his habits of insobriety, an unfit person to have the care and custody of these two infant children. It was alleged in the petition before the surrogate as a ground for withdrawing their custody from the father, that he claimed an adverse interest to them in certain property, to which they appeared by the record to be entitled. But that objection to him was overcome by his proposal to release whatever interest he might claim in that manner for their benefit. Upon the hearing before the surrogate the case took a much wider range, while this alleged disability on account of interest was not wholly overlooked. For the main ground upon which it was considered that the father would be not only an improper, but a dangerous custodian of these infants, was the intemperate habits which he was alleged to have formed previous to the time when the application was made. And affidavits of very many persons were produced on both sides of the controversy upon this point, and it was apparently upon the conviction that this fact had been established against the appellant, that the surrogate made the order from which the appeal has been brought. To support this appeal it has been objected in the outset, that the case should not have been heaid by the surrogate upon affidavits. But as the parties were at liberty to present it in that manner and elected to do so, the surrogate certainly had the power so to hear and decide it. If the evidence of the various withesses would have been better presented, as it probably would, by subjecting them to a direct and cross-examinatian, either before the surrogate himself, or a referee to be appointed by him, that objection should have been presented to him before the hearing of the controversy was commenced. But it was not. Neither does it appear to have been suggested, until the application for a rehearing of the case was made on behalf of the appellent, that a referee ought to have been appointed to afford him an opportunity for the cross examination of the witnesses testifying in support of the application. That was too late. The case had then been heard and decided by the surrogate, and all that remained was to determine whether upon the further proofs produced, the order had, or had not, been properly directed. The surrogate determined that it had been legally, sustained, and therefore made it final by the order afterwards entered. And the case is accordingly to be examined on the appeal through the instrumentalities presented to the surrogate for his consideration and decision.
The appellant intermarried with Matilda M. Mason cn the 1st of September, 1862, at Atlanta in the state.of *325 Georgia. He was at the time a surgeon in the confederate army. His wife had an elder sister residing with her, whom it was stipulated should live as a member of the family of herself and her husband, and she did reside with them until the 21th of September, 1882, when she died. After their marriage and the capture of the city of Atlanta by the Union forces under General Sherman, these parties took up their residence in the city of Savannah, and finally removed to and settled in the city of Hew York in the early part of the year 1866. There, the appellant acquired a large and lucrative practice in his profession as a physician, and the family continued to reside together until about the 1st of October, 1882, when Ms wife with the children, left his residence and proceeded to the state of Maryland where she had relatives, and continued to reside separately from Mm in that state until she died. The averred cause of her separation from her husband was the dissipated habits he had formed, and his conduct prompted by those habits towards herself and some of the children, evidently leading her to believe that her safety, as well as that of her cMldren, was only to be seemed in this manner. The appellant, in his own affidavit, as well as Ms letter to John H. Thomas, a cousin of his wife, attributes the condition of his domestic relations to the indifference, suspicion, and aspersions of his wife, aggregated by the "interference and conduct of her sister, and the perusal of these papers, as well as of other affidavits in the case, indicates the fact to be, that Ms complamts in this respect were not entirely groundless. But the concession of that fact in his behalf falls far short of disposing of this controversy. For if the disagreement and separation were engendered, as he states the fact to have been, between himself and Ms wife and her sister, it 'will not entitle him to the custody óf these two infant children, if at the time of the hearing and determination before the surrogate, he himself had acquired such habits as to render that unsafe and improper for them. It accordingly is not necessary to determine critically which of the parties may have been mostly in fault for the origin of their family disagreement. It is sufficient that it had arisen and produced disaffection as well as dissatisfaction, on his part. And the • existence of that circumstance may very" well have contributed to the development of habits rendering him an improper custodian for infant children. The family life so far as it included these differences was according to his own statement one of concealment. His pride as a gentleman and his deportment as a husband and father, led him to the avoidance of the public exposure of the true state of his family affairs. But at the same time it is beyond controversy that, this disagreement did exist, and that it finally *326 resulted in inducing the separation of his wife from him. Her complaints made to Hr. R. T. Merrick, who was also her relative, and to John H. Thomas, and her answer in an action brought by himself against her for a divorce in the territorial court of the territory of Dakota, discloses her conviction to have been deliberately formed, that neither herself nor her children could safely longer reside witty, the appellant as his wife and their father. Her complaints were founded upon his alleged habits of intemperance, his wilful neglect and abuse. And these complaints are entitled to consideration and weight in the disposition of the appeal. For he himself in his statements as to these two persons bore ample evidence of the good disposition, character and amiability of his wife, prior to the disagreement finally arising out of this alleged misconduct. And her character in that respect has been affirmed by these witnesses as well as by Edward B. Brady and Felix R. McManus who made affidavits in the case. And it has- also been conceded by the appellant, that if it had not been for the interference of her sister, that he and his wife would have been able to live comfortably and contentedly together. There is a probability therefore, arising out of this part of the case, that the great change leading to the rupture of the family, arose primarily out of the conduct of the husband, and not that of the wife; and it is confirmed by the circumstance that he sought a divorce from her by a proceeding in a distant territory, and married again at the expiration of about three weeks after her decease. Tins view of the case is very decidedly maintained by the affidavit of the son, H. Mason Raborg, who has been appointed the guardian of these two infants. But as he seriously disagreed with his father, and has been contradicted directly by the latter in the statements made by him, his affidavits standing alone would not justify the withdrawal of these infants from the custody of their father. But in the material statements made by him he has been sustaimed by his sister Nannie. She was the oldest daughter of the family, having attained the age of nineteen years at the time when the hearing took place before the surrogate. With her the father seems to have no other ground of complaint than the conclusion she had adopted concerning his conduct. No motive of resentment appears on her part towards him, but rather one of painful regret in the necessity which had arisen for the exposure of the family difficulties. Her testimony is direct and positive that his habits had become dissipated, that he was intoxicated in his family, and offensive in his conduct, both towards his wife and his elder children. And she agrees with her brother in the statement that at the time when one of the children died in the house, he was so stupidly in *327 toxicated as to be incapable of being made aware of this family calamity, and after that when he obtained the custody of the two children to accompany him to the city of New York, and called upon her at the hospital in the city of Baltimore, she states that he was in an intoxicated condition. And her statement as to that fact is directly corroborated and sustained by Eliza S. Thomas, who was with her at the time.
Immediately prior to the separation of himself and his wife, at the instance of the elder son, he was taken to St. "Vincent’s Hospital, in the city of New York, as a person who was then suffering from delirium tremens. That is stated positively, to have been his condition by Edward B. Brady, a Catholic priest of the city of New York, who knew him well and contributed to this confinement. And this view of his condition, at that time, is also affirmed by Lawrence J. McNamara, a physician at the hospital. This condition has been denied by the appellant himself, and so it has by the witnesses Michael Dowd, who was a nurse in the hospital, by Julia G. Raborg, his sister, and Sarah Eraynor, who was employed as a cook in his household. But the denial made of this fact by these persons is deprived of much of its weight and effect from the circumstance that they all concede him to have been in a condition of mental and bodily suffering which they attribute in their judgment to other causes. And while they may sincerely have done so, it is still probable from the evidence of the physician of the hospital, that they were mistaken. That he was addicted to habits of intoxication is further maintained by the witness Albert R. LeDoux, who occupied a portion of the dwelling in which the doctor had his office. This witness had frequently seen him entering and leaving the building when he appeared to be under the influence of liquor, or of some stimulating drug. And his evidence, together with that which has been mentioned before, and that of John H. Thomas, present a very strong case against the appellant, exhibiting a state of habit and conduct rendering him an entirely improper person to have the charge, care and custody of infant children.
To further meet this charge, the affidavits also of Seligman Gutman, a patient of the appellant, Michael McDonnell, the cashier of a commission dry goods house, Mary A. Fitzgerald, also a patient, John Sidley, a druggist at whose store he was a frequenter, John H. Conway and William A. Ewing, who were dispensary directors with him, Michael Bolten, a watchman employed in the vicinity of his dwelling, Ira F. Aldridge, his office boy and driver, William Fisher, a butcher with whom he dealt, Alphonso F. Spencer a waiter at his residence, Ellen S. Shafer, Sarah Wilson *328 arid Elise Letzeizer, nurses in the family, Maria Snedden, a domestic, and Sarah Traynor, a cook, were read upon the first and second hearings before the surrogate. But they do not overcome the weight and effect of the evidence produced to support the application. For as before observed, it was the design and purpose of the appellant at all times to conceal whatever might be derogatory, or made the subject of unfavorable comment, concerning himself or his family, from the observation of persons who were not its immediate members. And as his conduct was governed by this motive, the fact that these persons neither of them saw him drinking or in an intoxicated condition, adds very little weight or support to his own statements concerning this fact.
This disposition to conceal the true condition of his family affairs extended so far as to include the commendation by himself of the character and conduct of his wife’s sister, who is now alleged to have been the substantial cause of the disagreement and trouble arising in his household.' His conduct toward this woman has been highly commended by Jennie Colter, Maria Snedden and Sarah Traynor, while at the same time, from his own affidavit, a most decided feeling of repulsion arid repugnance existed on his part for her, as well as on her part for him. To John H. The mas he commended her in the most exalted language, and the reason prompting him to this conduct and commendation, was probably the desire to conceal from others the tine state of what now are alleged by him to have been his family relations. From this condition of his family í flairs, the persons whose affidavits have been made in his behalf, could make them with truth and propriety cn account of the circumstance that a simulated appearance had been maintained and exhibited in the presence and observations of these individuals. No great weight, therefore, can be placed upon the evidence of these individuals, but the strength and cogency of the proof is to be found in the evidence of the witnesses sustaining the application, advanced as that is by the last expression of the desire of his dying wife, that the custody of these children should be withheld from him. And this proof exhibits the habits and ccncluct of the appellant to be such as to render it not only improper but an act of rashness and danger, to entrust him with the care and custody of these two infant children. They have, it is true, decided affection for him as their father,' and implicitly and confidingly, are willing to rely upon him, but their ages respectively are such as to render them incapable of accurately judging for themselves what t'heir own geed and future protection absolutely require. They can literally know nothing of the habits and conduct of their father *329 beyond what has appeared in his relations with them. And the court cannot be, to any sensible degree controlled in their disposition by the expression of the inclination of either or both of them. What is to be considered and looked at as the object controlling the proceeding, is the support, preservation, education, safety,' and the promotion of the correct conduct of these children. The point to be determined is how will that best be secured, whether by allowing the father, with his second wife having no interest in them, to remain as their custodian, or confer that upon another person. If his habits have been such as they appear to have been as to demoralize and endanger the safety and future condition of these children, then he should be deprived of their possession and control as their natural custodian. This subject was quite fully considered in Matter of Watson (10 Abb., New Cases, 215), where this conclusion was deemed to be well maintained by the decided authorities. And it is sustained by Matter of Welch (14 N Y., 299), and the evidence in the case cannot be otherwise regarded than as sufficient to support the conclusion that the future of these children would be both unwise and unsafe under his direction.
It would probably have been preferable if a suitable person, willing to receive and care for the children, could have been selected to commit their custody to, rather than their elder brother, whose age and business have not fully fitted him for this position. Still as it appeared before the surrogate, as it now does also, that he is a person engaged in a, credible business occupation, in good health, and free from disreputable habits, he was the only individual to whom the care and custody of these children could legally be given. Misconduct has been attributed to him by Maria Snedden, Sarah Traynor and Jennie Colter, but the truth of the accusations is as positively contradicted by himself, and by his sister Nannie, whose statements so far as they are contained in the case seem to be worthy of entire confidence. No different disposition appeared to be within the power of the surrogate, and under the circumstances the best alternative that presented itself was to place these children as well as their property in the care and custody of this elder brother.
But the order which was made was more stringently against the appellant than the circumstances will justify, forit has reserved no liberty to him at any time to visit, ór see, these children. In that respect it should be modified, allowing him as often as twice a month, if he should be disposed so-to do, to visit these children, but denying him the privilege of doing so while in the least under the influence of liquor,. *330 or any stimulating drug. It has been further alleged upon his part that since the year 1884, he has been free from the use of intoxicants and other stimulants. If this statement is the truth, or substantially true, and he shall continue to observe and maintain habits of strict sobriety until it can be clearly seen that no further danger exists of a relapse on his part, then the order should be still further modified ■so as to permit him when that shall become an ascertained fact, to apply for its revocation, and the commission of the care and custody of these infant children to himself. But for the present that care and custody should remain where it has been placed by the order, and with this modification the order should be affirmed but without costs.
Macomber and Brady, JJ., concur.